IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PayPulz, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KOHL'S, INC.,<br><br>Defendant. | Case No.<br><br>Jury Trial Demanded |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, PayPulz, LLC ("PayPulz") files this Complaint against Defendant, Kohl's, Inc. (referred to herein as "Kohl's" or "Defendant") for patent infringement of United States Patent No. 12,699,985 ("the '985 Patent" attached as **Exhibit 1**), and alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

2. PayPulz seeks monetary damages.

## THE PARTIES

3. PayPulz is a limited liability company organized under the laws of the State of Texas with its principal place of business situated at 700 South Central Expressway, Suite 400, Allen, TX 75013–8113.

4. PayPulz owns all right, title, and interest in the ’985 Patent. The concepts claimed in the ’985 Patent were invented by James D. Bennett, a prolific technologist. Mr. Bennett held electrical and computer engineering roles at several major technology companies. Mr. Bennett has more than 40 years of experience with computer-implemented systems and methods, including systems for processing electronic transactions, online interactions, server-based data communications, and networked transaction processing. (*See* Declaration of James Duane Bennett under 37 C.F.R. § 1.132, submitted during the prosecution of the ’985 Patent and attached as **Exhibit 4** (“Bennett Decl.”) at ¶ 2).

5. On information and belief, Defendant Kohl’s, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at N56 W17000 Ridgewood Drive, Menomonee Falls, WI 53051.

6. On information and belief, Kohl’s Inc. may be served with process through its registered agent, Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, New Castle, DE 19803 or wherever it may be found.

7. Kohl’s Inc. has been authorized to do business in the State of Texas and the Eastern District of Texas since on or about July 22, 1998, under Texas SoS File Number 0012217806.

8. On information and belief, Kohl's operates more than 1,100 retail stores in 49 states, including at least 80 retail stores in the State of Texas, several of which are located in this District, and operates an online store at Kohls.com and companion mobile application for Android and iOS. *See e.g.*, https://www.kohls.com/stores/tx.shtml .

9. On information and belief, Kohl's sells and offers to sell products and services throughout Texas, including in this Judicial District, as well as throughout the United States, and introduces products and services that perform infringing processes into the stream of commerce knowing that they would be used, offered for sale, or sold in this Judicial District and elsewhere in the United States.

## JURISDICTION AND VENUE

10. This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, 284, and 285, among others. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

11. This Court has personal jurisdiction over Kohl's because Kohl's has committed and continues to commit acts of infringement in this judicial district in violation of 35 U.S.C. §§ 271(a). In particular, on information and belief, Kohl's has made, used, offered to sell access to, and/or sold access to the accused Kohl's Shopping Products and Services (defined below) in the Eastern District of Texas, and has made, used, offered to sell access to, and/or sold access to the Kohl's Shopping System (defined below) in the Eastern District of Texas.

12. Additionally, this Court has personal jurisdiction over Kohl's because, at least as early as August 4, 2026, Kohl's received actual notice of its infringing activities, on information and belief it continues to commit acts of inducement in this judicial district in violation of 35 U.S.C. § 271(b). In particular, on information and belief, Kohl's has induced its customers and end users to use the accused Kohl's Shopping Products and Services and the Kohl's Shopping System, including but not limited to those customers and end users residing in the Eastern District of Texas.

13. On information and belief, Kohl's customers located in the Eastern District of Texas have obtained access to and used the accused Kohl's Shopping Products and Services and Kohl's Shopping System while located in the Eastern District of Texas, including but not limited to while physically present in in Kohl's retail locations that are located in the Judicial District.




*See* https://www.kohls.com/feature/app.jsp.

14. Kohl's is subject to the Court's jurisdiction because it regularly conducts and solicits business, or otherwise engages in other persistent courses of conduct in this Judicial District, and/or derives substantial revenue from the use, sale, and distribution of goods and services, including but not limited to the accused Kohl's Shopping Products and Services provided to individuals and businesses in the Eastern District of Texas.

15. Kohl's infringes the patent-in-suit in the Eastern District of Texas, at least, by making, using, offering to sell access to, and/or selling access to the accused Kohl's Shopping Products and Services in the Eastern District of Texas, and its making, use, offering to sell access to, and/or selling access to the Kohl's Shopping System.

16. Indeed, on information and belief, Kohl's operates at least 80 retail stores in the State of Texas alone.

**89 Stores in Texas**

| | | | | |
|---|---|---|---|---|
| ABILENE (1) | AMARILLO (1) | ARLINGTON (1) | ATASCOCITA (1) | AUSTIN (1) |
| BAYTOWN (1) | BEAUMONT (1) | BROWNSVILLE (1) | BURLESON (1) | CARROLLTON (1) |
| CEDAR HILL (1) | COLLEGE STATION (1) | CONROE (2) | CORPUS CHRISTI (1) | CYPRESS (2) |
| DALLAS (1) | DENTON (1) | EAGLE PASS (1) | EL PASO (3) | FLOWER MOUND (1) |
| FORNEY (1) | FORT WORTH (1) | FRIENDSWOOD (1) | FRISCO (1) | GARLAND (1) |
| GEORGETOWN (1) | GRAND PRAIRIE (1) | HARLINGEN (1) | HOUSTON (4) | HUMBLE (1) |
| IRVING (1) | KATY WEST (1) | KELLER (1) | KILLEEN (1) | KYLE (1) |
| LAKE JACKSON (1) | LAKE WORTH (1) | LAREDO (1) | LEAGUE CITY (1) | LEANDER (1) |
| LEWISVILLE (1) | LIVE OAK (1) | LONGVIEW (1) | LUBBOCK (1) | MANSFIELD (1) |
| MCALLEN (1) | MCKINNEY (1) | MESQUITE (1) | MEYERLAND (1) | MIDLAND (1) |
| MISSION (1) | MISSOURI CITY (1) | NEW BRAUNFELS (1) | NORTH RICHLAND HILLS (1) | ODESSA (1) |
| PASADENA (1) | PEARLAND (1) | PFLUGERVILLE (1) | PLANO (2) | PROSPER (1) |
| RICHMOND (1) | ROCKWALL (1) | ROSENBERG (1) | ROUND ROCK (1) | SAN ANGELO (1) |
| SAN ANTONIO (3) | SHERMAN (1) | SOUTHLAKE (1) | SPRING (1) | SUNSET VALLEY (1) |
| TEMPLE (1) | TEXARKANA (1) | TOMBALL (1) | TYLER (1) | VICTORIA (1) |
| WACO (1) | WEATHERFORD (1) | WICHITA FALLS (1) | WYLIE (1) | |

*See e.g.*, https://www.kohls.com/stores/tx.shtml .

17. On information and belief, the accused Kohl's Shopping Products and Services and/or the Kohl's Shopping System are advertised, made, used, sold and offered for sale by Kohl's, or its agents, at Kohl's retail stores, including those retail stores located in the Eastern District of Texas.

18. On information and belief, Kohl's customers located in the Eastern District of Texas have obtained access to and used the accused Kohl's Shopping Products and Services and/or the Kohl's Shopping System while located in the Eastern District of Texas.

19. The Court has personal jurisdiction over Kohl's at least because it has continuous business contacts in the State of Texas and in the Eastern District of Texas; Kohl's has engaged in business activities including transacting business in the Eastern District of Texas and purposefully directing its business activities, including the sale or offer for sale of the Kohl's Shopping Products and Services to the Eastern District of Texas to aid, abet, or contribute to the infringement of third parties in the Eastern District of Texas.

20. This Court has personal jurisdiction over Kohl's because, *inter alia*, Kohl's, on information and belief: (1) has committed acts of patent infringement in this Eastern District of Texas; (2) maintains a regular and established place of business in the Eastern District of Texas; (3) has substantial, continuous, and systematic contacts with this State and the Eastern District of Texas; (4) owns, manages, and operates facilities in this State and the Eastern District of Texas; (5) enjoys substantial income from its operations and sales in this State and the Eastern District of Texas; (6) employs Texas residents in this State and the Eastern District of Texas, and (7) solicits business using the Kohl's Shopping Products and Services, and the Kohl's Shopping System in this State and the Eastern District of Texas.

21. Venue is proper pursuant to 28 U.S.C. § 1400(b), at least because Kohl's, has committed acts of direct and indirect infringement in this Judicial District, and has regular and established places of business in this Judicial District, including retail stores throughout the District. *See, e.g.*, https://www.kohls.com/stores/tx.shtml.

22. By way of example, Kohl's, Inc. operates a regular and established place of business within this Judicial District at, among other locations, its retail store located at 3096 N. Eastman Rd., Ste. 100, Longview, Texas 75605 (Gregg County), where, on information and belief, Kohl's employs Texas residents, holds itself out as operating a Kohl's retail location, and conducts and supports the accused acts of infringement, including by promoting, supporting, and processing purchase transactions initiated through the accused Kohl's Shopping Products and Services for customers in this Division. *See* https://www.kohls.com/stores/tx/longview-1180.shtml.




3.0 (13)

3096 N EASTMAN RD STE 100
LONGVIEW, TX 75605

(903) 663-9639

DIRECTIONS | COUPONS

**Kohl's Longview Department & Clothing Store**

Locator / Texas / LONGVIEW / Kohl's Longview Department & Clothing Store

Your Kohl's Longview store, located at 3096 N EASTMAN RD, stocks amazing products for you, your family and your home – including apparel, shoes, accessories for women, men and children, home products, small electrics, bedding, luggage and more – and the national brands you love (Nike, Disney, Levi's, Keurig, KitchenAid). The Kohl's Longview store and its associates aim to offer an enjoyable, easy shopping experience and incredible savings to every Kohl's customer.

For your convenience, the Kohl's Longview store features Buy Online, Pick-Up in Store (BOPUS). By choosing the BOPUS option, you'll save on shipping charges and avoid delivery wait times. Learn more about BOPUS.

To use the Buy Online, Pick-Up in Store feature, shop Kohls.com to find the products you are interested in and click the "Pick Up In Store" button to see if the product is available at the Kohl's Longview location. If available, add the product to your bag and place your order. Once your order is available for pickup, a confirmation email will be sent to you. Then, simply bring a valid photo ID and your confirmation email to the Kohl's Longview store customer service desk to receive your items.

*Id.*

## BACKGROUND FACTS

23. On August 4, 2026, PayPulz, through its counsel, sent a formal patent notification letter (the "August 2026 Letter") by electronic mail and by FedEx to Ms. Jennie Kent, Chief Legal Officer & Corporate Secretary of Kohl's, with copies to Ms. Heidi Belongia, Kohl's Associate General Counsel – Intellectual Property, Ms. Meredith Wilkerson, Kohl's Senior Vice President, Deputy General Counsel, and Kohl's registered agent, Corporate Creations Network, Inc. A copy of the August 2026 Letter is attached as **Exhibit 2**.

24. The August 2026 Letter identified the '985 Patent by number, informed Kohl's that PayPulz's investigation had revealed that Kohl's infringes at least claim 1 of the '985 Patent through its use and operation of the Kohl's mobile application and the associated Kohl's server-side transaction-processing systems, and enclosed both a true and correct copy of the '985 Patent and a detailed claim chart setting forth PayPulz's element-by-element infringement analysis mapping claim 1 of the '985 Patent to the accused functionality. The claim chart enclosed with the August 2026 Letter is attached as **Exhibit 3**.

25. The August 2026 Letter expressly advised Kohl's that receipt of the letter "constitutes actual notice of infringement for purposes of 35 U.S.C. § 287," and that PayPulz reserved the right to seek enhanced damages for willful infringement under 35 U.S.C. § 284 and attorneys' fees under 35 U.S.C. § 285 for infringing activity occurring from and after the date of the letter.

26. The August 2026 Letter invited Kohl's to enter into licensing discussions and requested a written response no later than August 18, 2026.

27. On information and belief, Ms. Kent, Ms. Belongia, and Ms. Wilkerson each received the August 2026 Letter and its enclosures by email to their Kohl's email addresses on August 4, 2026.

28. On information and belief, the August 2026 Letter and its enclosures were also delivered to Kohl's by FedEx on or about August 7, 2026, and signed for by "M. Meyerhoff" at Kohl's, N56 W17000 Ridgewood Drive, Menomonee Falls, WI 53051 business address.

29. As of the date of filing this Complaint, Kohl's has not responded to the August 2026 Letter.

30. On information and belief, at all relevant times, Ms. Kent has served, and continues to serve, as Kohl's Chief Legal Officer & Corporate Secretary. *See*, https://www.linkedin.com/in/jennie-kent/.

31. On information and belief, at all relevant times, Ms. Belongia has served, and continues to serve, as Kohl's Associate General Counsel – Intellectual Property. *See* https://www.linkedin.com/in/heidi-belongia-17840445/.

32. On information and belief, at all relevant times, Ms. Wilkerson has served, and continues to serve, as Kohl's Senior Vice President, Deputy General Counsel. *See* https://www.linkedin.com/in/meredith-wilkerson-8315a42b/.

## ACCUSED PRODUCTS AND SERVICES

33. On information and belief, Kohl's has made, used, offered to sell and/or sold products and services, including the following specifically accused products and services: (1) websites owned, managed, operated, controlled and/or hosted by or on behalf of Kohl's, including but not limited to kohls.com; (2) smartphone, tablet, and wearable mobile applications owned, managed, operated, and/or controlled by or on behalf of Kohl's, including but not limited to the iOS and Android versions of the "Kohl's" mobile application (3) current or legacy products or services, which use, or have used, one or more of the foregoing products and services as a component product or component service; (4) combinations of products and/or services comprising, in whole or in part, two or more of the foregoing products and services; and (5) all other current or legacy products and services imported, made, used, sold, or offered for sale by Kohl's that operate, or have operated in a substantially similar manner as the above-listed products and services. (As used herein, one or more of the foregoing products and services are individually and collectively referred to as the accused "Kohl's Shopping Products and Services").

34. On information and belief, Kohl's, as well as the hardware and software components comprising the Kohl's Shopping Products and Services and/or that enable the Kohl's Shopping Products and Services to operate, including but not limited to servers, server software, webserver software, webserver hardware, website client software, mobile computing device client application software, payment-processing and transaction-processing hardware and software, networked communications hardware, network routers, network switches, network hubs, point-of-sale hardware, point-of-sale

software, back-end hardware, back-end software, cloud-based software, cloud-based hardware, and other hardware and software computing systems and components, and/or any of the foregoing which are supplied by Kohl's technology and payment processing vendors that act on its behalf (individually and collectively referred to herein as the accused "Kohl's Shopping System"), infringes (literally and/or under the doctrine of equivalents) at least one claim of the '985 Patent.

35. On information and belief, Kohl's operates the Kohl's Shopping System itself and/or through agents, contractors, payment processors, and other service providers acting at Kohl's direction and control. Kohl's selects and authorizes the payment methods that may be stored in and used through customer accounts, supplies, and authorizes the use of customers' stored payment methods, and receives and uses the resulting payments and transaction data in furtherance of its business. All such acts are performed for the benefit of Kohl's and at Kohl's direction.

**Technology Background**

36. The '985 Patent relates to a proxy payment system that improves the way computerized financial transactions are conducted across multiple monetary accounts. The '985 Patent's specification addresses the shortcomings of traditional credit and debit card usage, where individuals must carry and manage many different cards across numerous accounts. As the specification explains, a "typical person has a plurality of credit cards, ATM accounts, debit cards, checking accounts, SmartCards, charge cards, etc." (*See e.g.,* Ex. 1 at 1:44-59). Such cards "are likely to be lost, causing a

lot of worry and potentially financial trouble,"(*id.*) and "[l]ost cards often result from failing to retrieve a card from a vendor, such as a sales clerk at a store" (*id*. at 2:1-4).

37. The specification further identifies the technical failures of conventional single-account card transactions. "[W]hen a customer attempts to buy an item at a store using a credit card, the attempted sales transaction is rejected or denied due to insufficient funds, causing embarrassment to the customer. This occurs even when the user has other credit cards with sufficient credit." (*Id*. at 2:5-15). Conventional systems could not draw on a user's other available accounts to complete the transaction, and the transaction failures could result from, for example, "a downed network (including problems with the vendor's equipment to the card processor)." (*Id.*)

38. The '985 Patent describes a specific technological solution to these problems by requiring a proxy identifier associated with multiple financial accounts, used in conjunction with a server-side multi-source processing system ("MSPS") that intelligently manages transactions across multiple independent monetary accounts (*See e.g.,* Ex. 1 at Fig. 1).




FIG. 1

39. The multi-source processing system is built from a specific combination of interworking modules that collectively manage the multi-source transactions. For example, in one embodiment, "[t]he multi-source processing system 113 includes an account management module 115 that manages interactions with the plurality of user's accounts across multiple monetary sources 117, 121, 123, a transaction module 127, a transaction rules management module 129, and a user interaction module 131." (*See e.g.*, *id*. at 3:13-26, Fig. 1).

40. An aspect of the technical improvement is the MSPS's ability to apply user-defined or default allocation rules to determine how a given transaction is

processed across multiple accounts in real time. For example, "default transaction rules, saved in the transaction rules management module 129 and accessed by the transaction module 127, can specify that the amount of a sales transaction be distributed evenly across all credit card accounts held by the user across the various monetary sources 117, 121, and 123." (*See e.g.*, *id*. at 4:30-58, Fig. 1). Alternatively, the rules may direct the transaction to the lowest-interest credit card account, with any deficit charged to the account with the next-lowest interest. (*Id*.)

41. The specification details two modes by which the MSPS completes a multi-account transaction while maintaining compatibility with existing payment infrastructure. In a direct mode, the MSPS engages each selected account and returns the individual authorizations: "direct mode transaction involves conducting individual transactions with each of the targeted monetary sources and sending all received approvals and responses back to the POS device." (*See e.g.*, *id*. at 7:57-60, 9:10-10:2, Fig. 5).

42. In an indirect mode, the MSPS "conducts sub transactions with each of the targeted monetary sources while appearing to conduct one single overall transaction. In this mode, the POS device receives one single approval and authorization code from the MSPS, which it records for the sales transaction." (*See e.g.*, *id*. at 7:67-8:5, 10:2-42, Fig. 6, cls. 1-22).

43. To support the indirect mode, the MSPS generates a proxy authorization code and maintains a stored mapping between that code and the underlying per-account authorizations. The MSPS "delivers a proxy authorization code for a

transaction after receiving authorization codes from the selected one or more of the monetary sources 117, 121, 123." (*Id*. at 6:19-21.) "Such a proxy code would be used in lieu of individual authorization codes received from one or more monetary sources for a sales transaction conducted from a POS device." (*Id*. at 8:47-59, Fig 4.). When the MSPS determines that a proxy code is needed, "a proxy code is generated in block 440 and the mapping of the proxy code generated to the individual authorization codes received from one or more monetary sources is saved in a database or logged." (*Id*. at 8:60-9:3, Fig 4.).

44. The specification further discloses fault-tolerant transaction handling. For example, "if one of the targeted monetary source[s] returns a denial message with accompanying failure code, the MSPS, based on rules, determines alternative monetary sources to be contacted for completing the failed portions of the sales transactions." (*Id*. at 9:65-10:2). It also discloses security mechanisms, including that a "transaction completion confirmation is digitally signed, optionally, by the POS device, employing keys or other security information provided by the proxy card, for nonrepudiation." (*Id*. at 9:42-50).

45. The specification also describes user-controlled account management solution through the MSPS, including that the MSPS "makes it easy to lock and unlock user accounts" if they are compromised. (*See e.g., Id*. at 5:13-18, cls. 16-17). *See also*, *id*. at 1:51-55 ("A person is also likely to have savings and checking bank accounts at multiple banks, and managing all those accounts is not easy.")

46. All of the above-described features illustrate an integrated, server-centered architecture for multi-account financial transactions. As set forth below, the claims of the ’985 Patent are directed to a specific technological implementation of this architecture, comprising a server-performed networked protocol for processing indirect online purchase transactions that changes what transaction-authorization data is generated, stored, and transmitted within the payment network, and to whom it is exposed.

**United States Patent No. 12,699,985**

47. On August 4, 2026, the USPTO duly and legally issued United States Patent No. 12,699,985, entitled “Proxy Card Management System,” to inventor James D. Bennett. A true and correct copy of the ’985 Patent is attached as **Exhibit 1**.

48. The ’985 Patent issued from U.S. Patent Application No. 19/326,447, filed September 11, 2025, which claims priority through an unbroken chain of continuation applications to U.S. Patent Application No. 11/834,294, filed August 6, 2007 (now U.S. Patent No. 8,326,758). Accordingly, the ’985 Patent is entitled to a priority date at least as early as August 6, 2007.

49. The ’985 Patent is presumed valid under 35 U.S.C. § 282.

50. PayPulz owns all right, title, and interest in the ’985 Patent, including pursuant to assignments recorded with the USPTO at Reel/Frame 072228/0464 and Reel/Frame 072249/0936.

51. PayPulz has not granted Kohl's an approval, an authorization, or a license to the rights under the '985 Patent.

52. The '985 Patent contains twenty-two method claims, of which claim 1 is the sole independent claim. Claim 1 recites "[a] computer-implemented method for processing an indirect online purchase transaction by a server computer using a proxy identifier associated with a plurality of independent monetary accounts of a user." (Ex. 1, '985 Patent, cl. 1.) Every step of the claimed method is performed by the server computer.

53. As detailed in the paragraphs 54-57 below, the '985 Patent addresses a specific technical problem:

54. Prior to the inventions claimed in the '985 Patent, the state of the art suffered from the specific technical problems described above in paragraphs 36-46, which are incorporated here. For example, consumers were forced to carry many single-account payment cards, and conventional single-account transaction processing produced failed transactions, including denials for insufficient funds on one account "even when the user has other credit cards with sufficient credit" (Ex. 1, at 2:5-14). This is because conventional payment networks had no mechanism for allocating a purchase across a user's multiple independent accounts in a single transaction.

55. The conventional alternatives also presented a data-security problem that was inherent in the architecture of conventional payment processing. As the named inventor, James D. Bennett, explained in a sworn declaration submitted to, and considered by, the USPTO during prosecution of the '985 Patent:

> As of the earliest priority date, conventional payment-processing architectures commonly exposed account-identifying information and/or account-specific authorization information to merchant-facing devices, point-of-sale systems, merchant computers, or transaction-processing networks as part of completing a transaction.

(Ex. 4, Bennett Decl. ¶ 17.)

56. That exposure was not merely a commercial inconvenience.

> Merchant fraud was a significant problem associated with conventional payment-processing systems at that time. In conventional systems, merchant-facing devices, merchant servers, merchant networks, or merchant-side personnel could obtain transaction data, account-identifying data, or authorization-related information and use that information to lodge or attempt later unauthorized transactions. Thus, the exposure of underlying account and authorization information to merchant-facing systems was not merely a commercial concern. It was a technical security problem arising from how conventional transaction data was transmitted to, stored by, and processed within merchant-facing payment infrastructure.

(Ex. 4, Bennett Decl. ¶ 18.)

57. In a multi-account transaction environment, "such security risks multiplied because a single transaction could involve multiple underlying monetary accounts, multiple authorization responses, and multiple authorization-code values." (Ex. 4, Bennett Decl. ¶ 19.) And the problem was compounded by legacy-infrastructure incompatibility, because merchant-facing systems "were not designed to support multiple account interactions within a single transaction." (*Id.* ¶ 21.) The technical problem the claimed invention addresses is therefore "how to coordinate and manage authorization information from multiple independent monetary accounts while limiting the underlying account-specific information exposed to merchant-facing systems." (*Id.*

¶ 20.) This "is not merely a business problem of deciding how to pay for a purchase. It is a technical data-handling, legacy-system compatibility, communication-infrastructure, and security problem in a computer-networked transaction system involving many disparate merchant-facing environments of varying capability, quality, and connectivity." (*Id*. ¶ 22.)

58. As detailed in the paragraphs 59-69 below, the '985 Patent is directed to a specific technical solution:

59. Claim 1 of the '985 Patent claims a specific, server-side solution to the problems detailed above, through a technologically specific nine-step, server-side protocol that changes the path, content, and exposure of transaction-authorization data within a computer-networked payment-processing environment. (See Ex. 4, Bennett Decl. ¶¶ 12-16.)

60. First, claim 1 requires "receiving a payment processing request for the indirect online purchase transaction that includes the proxy identifier and a requested transaction amount." (Ex. 1, cl. 1.) The transaction is initiated with a proxy identifier, not the user's underlying account numbers. Because only the proxy identifier traverses the merchant-facing leg of the transaction, the claimed method removes the user's underlying account identifiers from the portions of the network where they were conventionally exposed. (Ex. 4, Bennett Decl. ¶ 23.)

61. Second, claim 1 requires "retrieving, in response to the payment processing request, (i) information identifying the plurality of independent monetary accounts and (ii) one or more allocation rules associated with the proxy identifier," and

"selecting, based on the one or more allocation rules associated with the proxy identifier, at least one of the plurality of independent monetary accounts to fund the indirect online purchase transaction and a respective portion of the requested transaction amount for each selected independent monetary account." (Ex. 1, cl. 1.)

62. The account-selection and amount-allocation logic is thus performed at the server, applying stored, user-associated allocation rules of the kind the specification describes. (*See id.* at 4:30-58 (*e.g.*, rules distributing a transaction evenly across accounts, or charging the lowest-interest account first); 5:3-12 (rules selected based on a "transaction type indicator" including "online purchase"); 6:49-7:3 (describing rules creation and storage modules).) Centralizing this logic at the server relieves merchant-facing devices of any need to interact separately with each of the user's accounts to initiate a multi-account transaction. (*See* Ex. 4, Bennett Decl. ¶¶ 20-21, 24.)

63. Third, claim 1 requires "initiating, for each selected independent monetary account, a payment for a respective portion of the requested transaction amount from that independent monetary account," and "obtaining authorization information from respective payment processing systems associated with each selected independent monetary account." (Ex. 1, '985 Patent, cl. 1.) The server conducts the constituent multi-account transactions, which the specification notes unconventionally appears as "one single overall transaction" with "one single approval and authorization code." (*Id*. at 7:67-8:5.)

64. Fourth, claim 1 requires "generating, based on the authorization information, a proxy authorization code for the indirect online purchase transaction."

(*Id.*, cl. 1.) As the specification explains, the MSPS "delivers a proxy authorization code for a transaction after receiving authorization codes from the selected one or more of the monetary sources 117, 121, 123." (*Id.* at 6:19-21.)

65. Fifth, claim 1 requires "storing, in memory, mapping data associating the proxy authorization code with respective authorization information corresponding to each selected independent monetary account." (*Id.*, cl. 1.) The specification describes this operation: "a proxy code is generated in block 440 and the mapping of the proxy code generated to the individual authorization codes received from one or more monetary sources is saved in a database or logged." (*Id.* at 8:65-9:1; Fig. 4.)

66. Sixth, claim 1 requires "transmitting respective allocation data of the requested transaction amount to the selected independent monetary accounts," and finally "transmitting the proxy authorization code in lieu of the respective authorization information corresponding to the selected independent monetary accounts." (*Id.* cl. 1). *See also, id.* at 8:47-59, Fig 4.

67. The ordered combination of these steps "define[s] a server-side transaction-processing architecture in which authorization information from multiple independent payment systems is collected, associated with a proxy authorization code, stored as mapping data, and withheld from the merchant-facing transaction environment." (*See* Ex. 4, Bennett Decl. ¶ 15.)

68. The claimed method thereby "changes the transaction-data flow by substituting a proxy authorization code for the underlying authorization information, maintaining management of the multi-account transaction process at a server-side

system trusted with the underlying account and authorization information, and storing mapping data that associates the proxy authorization code with the underlying authorization information while shielding that underlying authorization information from the merchant-facing transaction environment." (*Id.* ¶ 28.)

69. The claimed protocol therefore yields concrete technological benefits. For example, it reduces the exposure of account-identifying and account-specific authorization information, "minimizing risks of subsequent fraudulent transactions" (Ex. 4, Bennett Decl. ¶ 26); it permits a single online purchase to be funded by multiple independent accounts while the merchant-facing environment processes one transaction with one authorization code, preserving compatibility with existing and legacy transaction infrastructure (*id.* ¶¶ 21, 25, 27; Ex. 1 at 7:67-8:5); and it reduces failed transactions by enabling rule-based, multi-account funding and fault-tolerant reallocation (Ex. 1 at 4:30-58, 9:65-10:2).

70. As detailed in paragraphs 71-74 below, the claims of the '985 Patent improve the functioning of computer-networked payment systems and are not directed to an abstract idea.

71. For example, the claims of the '985 Patent are not directed to an abstract idea. Like the claims held eligible in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), the claims of the '985 Patent are directed to a specific improvement in the way computer-networked transaction systems operate. Namely, a server-side data-handling architecture that changes what authorization data is generated, where it is stored, what is transmitted in its place, and what is exposed to merchant-facing

systems, rather than to an abstract idea for which computers are invoked merely as a tool. (*See e.g.*, Ex. 4, Bennett Decl. ¶¶ 16, 33-36.)

72. Like the claims held eligible in *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), claim 1 does not merely recite a desired result; it prescribes a specific set of rules and steps, (including rule-based account selection and allocation, per-account payment initiation, per-account authorization collection, proxy-authorization-code generation, server-side storage of code-to-authorization mapping data, and transmission of the proxy code in lieu of the underlying authorization information), by which the result is achieved.

73. The claimed invention is also "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). For example, a prior art problem of exposure of account-identifying and authorization data in computerized payment processing, is a technical security and data-handling problem that arises only within computer-networked transaction infrastructure. (Ex. 4, Bennett Decl. ¶¶ 17-22, 36.) The claimed improvement is therefore "rooted in computer-network transaction processing and server-side data mapping." (*Id.* ¶ 36.)

74. The claimed methods are not mental processes. As the inventor declared, the claimed method is not "merely a mental allocation process, a human decision about which account to use, or generic computerization," and the claimed operations "are not merely ordinary mental steps performed faster on a computer." (*Id.* ¶ 29.) Rather, they "require computer-network communications with multiple account-servicing and

payment-processing systems, server-side processing of digital authorization information, generation of a proxy authorization code, and storage in memory of mapping data associating the proxy authorization code with the underlying authorization information." (*Id*.) During prosecution, the USPTO examiner reached the same conclusion, finding that "Applicant's arguments regarding the 101 rejections of the claims are persuasive" because the allowed claims "tie the abstract idea to the processing of the proxy authorization code to the server computer in ways that cannot be duplicated manually particularly because the authorization codes cannot be generated, stored and associated with the individual authorization codes at least without the use of a computer." (Ex. 5, Notice of Allowability at 2.)

75. As detailed in paragraphs 76-79 below, the claims of the '985 Patent are directed to a combination that was not well-understood, routine, or conventional.

76. The claims of the '985 Patent recite an inventive concept rendering them patent eligible. As in *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-50 (Fed. Cir. 2016), the specific combination of elements recited in claim 1, (including a proxy identifier standing in for a plurality of independent monetary accounts; server-side retrieval and application of stored allocation rules; per-account payment initiation and authorization collection; generation of a proxy authorization code from the collected authorization information; server-side storage of mapping data associating the code with the underlying authorization information; and transmission of the proxy authorization code in lieu of that information) supplies an inventive concept that is significantly more than any abstract idea. (*Accord, id.*)

77. The claimed inventions of the ’985 Patent were not well-understood, routine, or conventional at the time of the invention. As the inventor declared to the USPTO:

> As of the earliest priority date, conventional payment-processing systems of which I was aware did not provide the particular ordered combination recited in [claim 1] for an indirect multi-account transaction, … that ordered combination was not a routine or conventional data-handling arrangement for a multi-account payment-processing system as of the earliest priority date.

(Ex. 4, Bennett Decl. ¶¶ 30, 32.)

78. The USPTO’s own examination record confirms the non-conventionality of the claimed combination. The examiner, after searching the relevant prior art, expressly found that “[t]he prior art does not disclose, either alone or in combination, the elements of the independent claims.” (Ex. 5, Notice of Allowability at 3.)

79. Conventional payment-processing architectures, by contrast, transmitted underlying account and authorization information into the transaction processing environment. (Ex. 4, Bennett Decl. ¶¶ 17-19, 31.) The claimed inversion of that conventional data flow, by collecting, associating, and retaining the sensitive authorization data server-side while transmitting only a proxy authorization code outward, was a departure from, not an application of, the conventional arrangement. (*Id.*)

80. As detailed in paragraphs 81-88 below, the asserted dependent claims of the ’985 Patent recite additional patent eligible and non-conventional limitations.

81. The dependent claims of the ’985 Patent recite additional specific technical features that further support eligibility and non-conventionality, including at least the following.

82. For example, Claim 3 of the ’985 Patent is further directed to eligible subject matter, at least, because it claims, “transmitting a digital signature using a cryptographic key or other security credential to ensure non-repudiation.” (Ex. 1, ’985 Patent, cl. 3.) This is, at least, because cryptographic signing of the transmitted proxy authorization code is a specific computer-security technique that is grounded in the specification’s disclosure of digitally signed transaction confirmations “employing keys or other security information . . . for non repudiation” (*id*. at 9:42-50, 10:31-38). Those specifically claimed features improve the security and integrity of the claimed transaction protocol.

83. By way of further examples, Claims 5 through 8 of the ’985 Patent are directed to eligible subject matter at least because they claim transmitting “a plurality of separate authorization requests to respective payment processing systems,” “receiving a plurality of individual authorization responses,” “determining an overall authorization result” (claim 5), and upon “detecting that one of the individual authorization responses indicates an authorization failure, … reallocating at least a reallocated portion of the requested transaction amount amongst the independent monetary accounts . . . and initiating at least one additional authorization request for the reallocated portion” (claim 6), including reallocation based on “a predetermined priority or ranking” (claim 7) or on rules that “consider an available balance” (claim 8).

(*See, id*. at cls. 5-8. *See also*, *id*. at 9:65-10:2.) This is, at least, because these claims recite a fault-tolerant, multi-system authorization that no conventional single-account authorization flow performed.

84. By way of further examples, Claims 9, 10, and 22 are directed to eligible subject matter, at least, because they claim storing "a transaction record that includes the overall requested online transaction authorization result and a breakdown of the requested transaction amount allocated to each selected independent monetary account[]" (claim 9), storing "a digitally signed transaction completion confirmation" signed "using security information associated with the proxy identifier" (claim 10), and transmitting a confirmation message with a per-account "allocation summary" (claim 22). (*See, id*. at cls. 9, 10, and 22). This is, at least, because these dependent claims recite specific, security-hardened server-side data structures for recording and confirming multi-account transactions.

85. By way of further example, Claim 13 is directed to eligible subject matter, at least, because it claims, "completing the indirect online purchase transaction by initiating settlement . . . such that a merchant account receives payment from each of the selected independent monetary accounts." (*Id.* cl. 13.) This is, at least, because multi-source settlement of a single merchant transaction requires the server-side coordination of multiple payment networks within one purchase, which is a concrete, networked-transaction operation.

86. By way of further examples, Claims 14 and 15 are directed to eligible subject matter at least because they claim, "retrieving from a data store, the one or more

allocation rules" and "automatically determining an allocation . . . based on applying the one or more allocation rules" (claim 14), including rules that allocate "based on one or more transaction parameters . . . including at least an available balance." (claim 15). (*Id.* cl. 14-15.) This is, at least, because automatic, parameter-driven allocation performed by the server against stored rules is a specific technical mechanism, not a mental act of choosing how to pay.

87. By way of further examples, Claims 16 through 18 are directed to eligible subject matter at least because they claim receiving, "via the Internet from a client device," an instruction to disassociate an account from the proxy identifier and "disassociating the proxy identifier and a reference identifier corresponding to the one independent monetary account to detach the one independent monetary account without having to engage in closure of the one independent monetary account" (claim 16), implemented by "updating a mapping stored in a data storage such that subsequent online purchase transaction requests associated with the proxy identifier do not involve the detached independent monetary account" (claim 17), as well as associating newly added accounts (claim 18). (*Id.* cl. 16-18.) This is, at least, because these claims recite specific server-side mapping-data operations that decouple credential management from account lifecycle, thereby allowing a compromised or unwanted account to be detached from the proxy identifier by a mapping update, without closing the underlying account. (*See id*. at 5:14-16; 10:43-11:5; Fig. 7.)

88. By way of further examples, Claims 19 through 21 are directed to eligible subject matter, at least, because they claim aggregating transaction records across

transactions (claim 19), "updating at least one allocation rule based on the aggregated transaction records" such that subsequent allocations are modified (claim 20), and generating and transmitting spending reports (claim 21). This is, at least, because claim 20 in particular recites an adaptive, feedback-driven rules engine, wherein the server modifies its own allocation behavior based on accumulated transaction data, which is a specific improvement in how the claimed transaction-processing system operates over time.

89. The '985 Patent recently issued over a § 101 rejection after examination under current eligibility standards. *See* **Exhibit 5** (Notice of Allowance, dated May 29, 2026). Unlike patents examined before *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), the '985 Patent was examined and allowed in 2025-2026, entirely under the USPTO's current, post-*Alice* subject-matter-eligibility framework, by Art Unit 3694, the business-methods art unit responsible for electronic payment technologies.

90. During prosecution, in an Office Action dated March 3, 2026, the examiner initially rejected the pending claims under 35 U.S.C. § 101.

91. On May 8, 2026, PayPulz responded with claim amendments and a detailed eligibility showing. The response was supported by the sworn Declaration of James D. Bennett under 37 C.F.R. § 1.132, entitled "Subject Matter Eligibility — Technical Facts Regarding Amended Claim 31," which is the application claim that issued as claim 1. (Ex. 4.) The Bennett Declaration set forth the technical problem addressed by the claims (Ex. 4, Bennett Decl. ¶¶ 17-22), the specific server-side architecture recited in the claims (*id.* ¶¶ 13-16, 23-29), and the non-conventionality of

the claimed ordered combination as of the priority date (*id*. ¶¶ 30-32). The accompanying remarks explained, element by element, how the claimed protocol improves the security of online purchase transaction data, the efficiency of servicing data networks, and the security of stored data. (**Exhibit 6**, May 8, 2026, Remarks at 10-17.)

92. In the Notice of Allowability, the examiner expressly withdrew the § 101 rejection, noting that the "Applicant's arguments regarding the 101 rejections of the claims are persuasive and the rejection is withdrawn." (Ex. 5, Notice of Allowability at 2.) The examiner found that "the additional elements and combination of elements provides for an inventive concept," explaining that the allowed limitations "make the claim eligible because these limitations tie the abstract idea to the processing of the proxy authorization code to the server computer in ways that cannot be duplicated manually particularly because the authorization codes cannot be generated, stored and associated with the individual authorization codes at least without the use of a computer." (Id.)

93. The examiner also withdrew the prior-art rejections, finding that "[t]he prior art does not disclose storing, in memory, mapping data associating the proxy authorization code with respective authorization information corresponding to each selected independent monetary account; transmitting respective allocation data of the requested transaction amount to the selected independent monetary accounts; and transmitting the proxy authorization code in lieu of the respective authorization information corresponding to the selected independent monetary accounts." (Ex. 5,

Notice of Allowability at 3.) The examiner's statement of reasons for allowance confirmed that "[t]he prior art does not disclose, either alone or in combination, the elements of the independent claims." (Id.)

94. The USPTO's determination, made on a developed examination record, supported by sworn technical evidence, and under the currently applicable eligibility standards, that the claims of the '985 Patent recite an inventive concept and are patent eligible is a factual and administrative determination that further supports the eligibility of the '985 Patent's claims.

95. Whether the claimed elements of the '985 Patent were well-understood, routine, and conventional at the time of the invention is a question of fact. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The factual allegations set forth herein, as supported by the specification of the '985 Patent, the sworn Bennett Declaration submitted to and credited by the USPTO (Ex. 4), and the USPTO's own independent examination findings (Ex. 5), must all be accepted as true at the pleading stage and preclude any finding of patent ineligibility under 35 U.S.C. § 101 on the pleadings.

## CLAIMS FOR RELIEF

### Count I – Infringement of United States Patent No. 12,699,985

96. PayPulz repeats, realleges, and incorporates by reference, as if fully set forth here, the allegations of the preceding paragraphs above.

97. On information and belief, Kohl's (or those acting on its behalf) makes, uses, sells, imports and/or offers to sell the Kohl's Shopping Products and Services; and makes, uses, sells, sells access to, imports, offers to sell and/or offers to sell access to the

Kohl's Shopping System in the United States that infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '985 patent.

98. Claim 1 of the '985 Patent provides as follows:

> 1. A computer-implemented method for processing an indirect online purchase transaction by a server computer using a proxy identifier associated with a plurality of independent monetary accounts of a user, the method comprising:
>
> > receiving a payment processing request for the indirect online purchase transaction that includes the proxy identifier and a requested transaction amount;
> >
> > retrieving, in response to the payment processing request, (i) information identifying the plurality of independent monetary accounts and (ii) one or more allocation rules associated with the proxy identifier;
> >
> > selecting, based on the one or more allocation rules associated with the proxy identifier, at least one of the plurality of independent monetary accounts to fund the indirect online purchase transaction and a respective portion of the requested transaction amount for each selected independent monetary account;
> >
> > initiating, for each selected independent monetary account, a payment for a respective portion of the requested transaction amount from that independent monetary account;
> >
> > obtaining authorization information from respective payment processing systems associated with each selected independent monetary account; generating, based on the authorization information, a proxy authorization code for the indirect online purchase transaction;

> storing, in memory, mapping data associating the proxy authorization code with respective authorization information corresponding to each selected independent monetary account;
>
> transmitting respective allocation data of the requested transaction amount to the selected independent monetary accounts; and
>
> transmitting the proxy authorization code in lieu of the respective authorization information corresponding to the selected independent monetary accounts.

(*See* Ex. 1, cl. 1)

99. Kohl's directly infringes, at least, claim 1 of the '985 patent and is in violation of 35 U.S.C. § 271(a) by making, using, selling, importing, and/or offering to sell the Kohl's Shopping Products and Services; and making, using, selling, selling access to, importing, offering for sale, and/or offering to sell access to the Kohl's Shopping System.

100. Kohl's (or those acting on its behalf, including with respect to Kohl's internal use for testing and development purposes) makes, uses, sells, offers to sell, and/or sells access to the Kohl's Shopping Products and Services, and makes, uses, operates, sells, sells access to, offers to sell, and/or offers to sell access to the Kohl's Shopping System, in the United States, and in doing so directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '985 Patent in violation of 35 U.S.C. § 271(a), including by performing, via the server computers of the the

Kohl's Shopping System, each step of the method of at least claim 1 when Kohl's customers make purchases through the Kohl's Shopping Products and Services.

101. A customer's Kohl's account and its associated Rewards identifier constitute "a proxy identifier associated with a plurality of independent monetary accounts of a user." A Kohl's customer can store in the customer's Kohl's account, and use through the Kohl's Shopping Products and Services, a plurality of independent monetary accounts, including, for example, one or more Kohl's Gift Cards, Kohl's Cash, a Kohl's Card (Kohl's private-label credit card), and one or more third-party credit or debit cards. During online checkout through the Kohl's mobile application or kohls.com, the customer transacts using the customer's Kohl's account credentials, not by presenting the underlying monetary accounts themselves, and Kohl's, not the customer, thereafter conducts the constituent payment transactions with the underlying accounts server-side, while the customer sees a single overall transaction. (*See* Ex. 3.)

102. A claim chart demonstrating, on an element-by-element basis, how the Kohl's Shopping Products and Services and the Kohl's Shopping System practice each and every limitation of at least claim 1[1] of the '985 Patent is attached as **Exhibit 3** and is incorporated herein by reference as if fully set forth herein. The same element-by-element analysis was provided to Kohl's on August 4, 2026, as an enclosure to the August 2026 Letter. (Exs. 2, 3.)

[1] Claim 1 of the '985 Patent was renumbered from Application Claim 31.

103. On information and belief, to the extent any step of at least claim 1 of the ’985 Patent is performed by Kohl’s agents, contractors, technology vendors, payment processors, or other service providers rather than by Kohl’s itself, Kohl’s is nevertheless liable for direct infringement under 35 U.S.C. § 271(a) because Kohl’s directs or controls the performance of each such step. For example, and on information and belief, Kohl’s selects and engages those providers, supplies and authorizes the use of the customer account and payment data they process, conditions their participation in Kohl’s transaction processing on performance of the relevant processing steps, establishes the manner and timing of that performance, and receives the benefit of the completed transactions.

104. Since on or about August 4, 2026, and with knowledge of the ’985 patent, Kohl’s continues to indirectly infringe the claims of the ’985 patent by actively inducing the direct infringement by third parties such as its customers and/or other end-users of the Kohl’s Shopping Products and Services under 35 U.S.C. § 271(b).

105. Since at least on or about August 4, 2026, Kohl’s knowingly encouraged, and continues to encourage, its customers and/or other end-users to directly infringe one or more claims of the ’985 patent, including by Kohl’s actions that include, without limitation, instructing and encouraging its customers and/or other end-users to use the Kohl’s Shopping Products and Services in an infringing manner through the offering, publishing, distribution, and propagation of, its website, user guides, advertisements,

and promotional materials.[2]




*See e.g.*, https://www.kohls.com/feature/app.jsp?icid=ft-connect-learn-more.

106. On information and belief, at least since on or about August 4, 2026, Kohl's understood that the acts Kohl's induced its customers and/or other end-users to take are actions that constitute patent infringement and that Kohl's encouraging acts resulted in direct infringement of one or more claims of the '985 patent by those customers and/or other end-users using the system recited in those claims including at least claim 1.

107. On information and belief, Kohl's customers and/or other end-users directly infringe one or more claims of the '985 patent through their use of the Kohl's Shopping Products and Services in accordance with Kohl's instruction and encouragement. Upon information and belief, Kohl's knows that those acts constitute

[2] *See, e.g.*, https://apps.apple.com/us/app/kohls-shopping-discounts/id472014516?mt=8;
https://www.kohls.com/feature/app.jsp?icid=ft-connect-learn-more;
https://www.kohls.com/feature/wallet_home.jsp;
https://www.kohls.com/faq/article/275;
https://www.kohls.com/faq/article/192;
https://www.kohls.com/faq/article/1345;
https://www.kohls.com/faq/article/184;
https://www.kohls.com/feature/privacy-policy.jsp;

infringement and acted with the intent to encourage such infringement. Alternatively, Kohl's was willfully blind to that fact because of deliberately avoiding learning of the infringement despite knowing that there is a high probability that the use by its customers and/or other end-users would constitute direct infringement.

108. The components of the Kohl's Shopping System are specifically configured to function in accordance with the '985 patent claims and are material parts of the invention.

109. In addition, as of on or about August 4, 2026, Kohl's knows of the '985 patent, the alleged acts of direct infringement, and Kohl's role in encouraging those acts of infringement. Its continuation of the above-referenced acts of inducement violates 35 U.S.C. § 271(b).

110. Kohl's direct and indirect infringement has damaged and continues to damage PayPulz and caused it to suffer and continue to suffer irreparable harm and damages.

111. Kohl's direct and indirect infringement of the '985 Patent has been, and continues to be, willful. Kohl's has had actual knowledge of the '985 Patent, and of PayPulz's charge that Kohl's infringes at least claim 1 of the '985 Patent, since no later than August 4, 2026, when it received the August 2026 Letter, which identified the '985 Patent by number, enclosed a copy of the patent, and enclosed a detailed element-by-element claim chart mapping claim 1 to the accused Kohl's functionality. (Exs. 2, 3.)

112. Despite that knowledge, Kohl's has not responded to the August 2026 Letter, has not sought or obtained a license from PayPulz, and, on information and

belief, has continued without interruption to operate the accused Kohl's Shopping Products and Services and Kohl's Shopping System in a manner that infringes at least claim 1 of the '985 Patent.

113. Kohl's continued infringement despite its actual knowledge of the '985 Patent and of PayPulz's infringement allegations constitutes willful infringement, entitling PayPulz to enhanced damages under 35 U.S.C. § 284 and supporting an award of attorneys' fees under 35 U.S.C. § 285.

114. PayPulz has been damaged, and continues to be damaged, by Kohl's infringement of the '985 Patent. PayPulz is entitled to recover damages adequate to compensate for Kohl's infringement, in an amount no less than a reasonable royalty, together with enhanced damages, interest, and costs as fixed by this Court.

## JURY DEMANDED

115. Pursuant to Federal Rule of Civil Procedure 38(b), PayPulz hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

PayPulz respectfully requests this Court to enter judgment in PayPulz's favor and against Kohl's as follows:

a. finding that Kohl's has infringed one or more claims of the '985 patent under 35 U.S.C. §§ 271(a) & 271(b);
b. awarding PayPulz damages under 35 U.S.C. § 284, or otherwise permitted by law, including supplemental damages for any continued post-verdict infringement;

c. awarding PayPulz pre-judgment and post-judgment interest on the damages award and costs;

d. awarding costs of this action (including all disbursements) and attorneys' fees pursuant to 35 U.S.C. § 285, or as otherwise permitted by the law; and

e. awarding such other costs and further relief that the Court determines to be just and equitable.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Oded Burger*
Oded Burger* (New York State Bar No. 4910808)
Erin Hadi* (DC Bar No. 90031321) (*pro hac vice* to be filed)
oburger@daignaultiyer.com
ehadi@daignaultiyer.com
**DAIGNAULT IYER LLP**
8229 Boone Boulevard, Suite 450
Vienna, VA 22182

*Attorneys for Plaintiff PayPulz, LLC*

*Not admitted to practice in Virginia